

Exhibit 1

# EXCLUSIVE LICENSE AND DISTRIBUTION AGREEMENT

This License Agreement ("Agreement") is entered into by and between La Colombe Torrefaction, Inc. (the "Licensor" or "La Colombe"), having offices at 2620 E. Tioga Street, Philadelphia, PA 19134, and Myung Kee Hwang and Linda Hwang of 224 Country Club Drive, Moorestown, NJ 08057 (collectively "Licensee" or "Hwangs") (collective, the "Parties").

## RECITALS

1.  BACKGROUND

    1.1    WHEREAS, Licensor owns and operates a variety of businesses related to products and services in connection with coffee, coffee related items and coffee roasting under the mark La Colombe and other similar trademarks, service marks, trade names, brands, logos and other distinctive identifications (collectively the "Licensed Marks") as well as operation of retail coffee shops and coffee roasting operations under a proprietary operating system (the "La Colombe System") including the Licensed Marks, designs and color schemes for coffee shops, signs, equipment layouts, formulas and specifications for certain food products, roasting of coffee, methods of inventory and operation control, bookkeeping and accounting and manuals covering business practices and policies, and general business and distribution operations.

    1.2    WHEREAS, on October 15, 2010 Licensor granted the Licensee an exclusive license (Appendix A) to use its trademarks in the continent of Asia, including but not limited to Japan, the Philippines, Indonesia and Singapore (the "2010 License").

    1.3    WHEREAS, the Parties wish to terminate the 2010 License which will be superseded by the Agreement herein and the Licensee has agreed to terminate all existing sublicenses granted by Licensee that provide rights outside of the Licensed Territory to any sublicensees.

    1.4    WHEREAS, Licensor owns the right to grant licenses for the adoption and use of the Licensed Marks, the La Colombe System and the Intellectual Property (as defined herein) of La Colombe and its Affiliates for the geographic area hereafter described.

    1.5    WHEREAS, Licensee desires to acquire a perpetual, royalty-free and exclusive license, with the right to sublicense, to the Licensed Marks in South Korea under the terms of this Agreement.

NOW THEREFORE, in consideration of the premises above and the mutual promises and obligations hereinafter set forth, Licensor and Licensee do hereby agree as set forth below:

2. **EFFECTIVE DATE**

    2.1    This Agreement shall be effective on this 29th day of August 2014 (the "Effective Date").

3. **DEFINITIONS**

    3.1    "Affiliate" means the following companies Les Cafés La Colombe, LLC, Café Development Group PHL, LLC, Café Development Group CHI, LLC, Café Development Group NYC, LLC, La Colombe Canada, LLC, La Colombe Brothers, Inc. and Indie Café Alliance, Inc.

    3.2    "Licensed Marks" means: trademarks, service marks, trade names, brands, logos and other distinctive identifications, owned by La Colombe or its Affiliates, used in connection with the La Colombe System and/or owned by La Colombe or its Affiliates currently in existence or to be created and owned by La Colombe or its Affiliates, including such marks as set forth in Appendix B, and foreign counterparts thereof.

    3.3    "Intellectual Property" means: trademarks, service marks, trade names, brands, logos and other distinctive identifications, trade secrets, including the Licensed Marks, patents, patent applications, designs, copyrights, confidential and proprietary information, formulations, recipes, coffee roasting recipes, methods, drawings, concepts, ideas, devices, testing information, processes and related procedures and process techniques, compositions, financial strategies, general commercial and sales strategies, advertising materials, know-how and goodwill of La Colombe and its Affiliates owned by and currently in existence or to be created and owned by La Colombe or its Affiliates, inclusive of those listed in Appendix C and foreign counterparts thereof.

    3.4    "Licensed Territory" means the country of the Republic of Korea (a/k/a South Korea).

    3.5    "Field of Use" means use in connection with business operations for cafes, and/or roasting and selling coffee beans, manufacturing and/or retail sale of goods and/or services in connection with coffee or operation of cafes, wholesale of goods and/or services in connection with coffee or operation of cafes, distribution of goods and/or services in connection with coffee, and for other goods and services conducted as part of the worldwide operations of La Colombe or its Affiliates.

    3.6    "Coffee" means goods and services related to coffee beverages, coffee beans, roasting of coffee, and coffee related food products.

    3.7    "Licensed Products" means any and all goods sold, offered for sale, distributed, or available for sale and/or services rendered by La Colombe or any of its Affiliates including, but not limited to, coffee, coffee beans, roasting of coffee, coffee related products and goods, and cafe services offering Coffee.

3.8 "La Colombe System" has the meaning set forth in Section 1.1 above.

3.9 "La Colombe Coffee" means coffee made using the La Colombe System, bearing the Marks, or otherwise affiliated with La Colombe.

4. GRANT OF RIGHTS

4.1 Subject to the terms and conditions set forth herein, Licensor grants to Licensee, and Licensee hereby accepts, an exclusive, fully paid, royalty-free and perpetual right, license and privilege to use the La Colombe System, the Licensed Marks and the Intellectual Property within the Field of Use in the Licensed Territory. Licensee shall also have the right to employ the trade name "La Colombe" in its United States corporate name e.g., "La Colombe Korea" for purposes of managing, developing and exploiting said rights within the Licensed Territory, and to advertise to the public that Licensee is an exclusive licensee of Licensor within the Licensed Territory.

4.2 Subject to the terms and conditions set forth herein, Licensor grants to Licensee, and Licensee hereby accepts, an exclusive, fully paid, royalty-free and perpetual right, license and privilege to sell, import and distribute into the Licensed Territory, and manufacture the Licensed Products within the Licensed Territory.

4.3 Subject to the terms and conditions set forth herein, Licensor grants to Licensee, and Licensee hereby accepts, an exclusive, fully paid, royalty-free and perpetual right, license and privilege to roast, manufacture, sell and distribute La Colombe Coffee within the Licensed Territory.

4.4 The license conferred under this Agreement shall be perpetual, subject to the provisions of Section 13.

4.5 Sublicense. Licensor acknowledges and understands that Licensee's ability to sublicense the rights conferred to Licensee under this Agreement to third parties is one of Licensee's strategies to exploit the value of the licensed rights granted hereunder and to enhance the market and value of the Licensed Products. Licensee shall have the right to sublicense the rights conferred under this Agreement, franchise such rights, partner with third parties or take any other action to exploit said rights solely within the Licensed Territory upon thirty (30) days prior written notice of Licensor. Any sublicense, franchise or partnership shall be conditioned upon such sublicensee, franchisee or partner agreeing in writing to be bound by the terms of this Agreement, including the intellectual property, quality control and confidentiality provisions. Licensee shall provide Licensor with a copy of the written instrument by which such sublicensee, franchisee or partner agrees to be so bound upon request of Licensor. Licensee has agreed to and will immediately after the Effective Date terminate all existing sublicenses granted by Licensee that provide rights outside of the Licensed Territory to any sublicensees.

4.6     Other than the sublicense rights of Section 4.5, and subject to Section 4.7, Licensee shall not have the right to transfer, sell, assign any rights conferred under this Agreement to any other entity without prior written approval of Licensor, provided that such approval will not be unreasonably withheld, it being understood that any assignee or transferee shall be obligated to agree in writing to be bound by the terms of this Agreement, including the intellectual property, quality control and confidentiality provisions.

4.7     Other than the rights granted herein, no other right or license is granted by Licensor to Licensee, either express or implied with respect to any other trademark, trade name, service mark, or other intellectual property right owned, possessed or licensed by or to Licensor.

4.8     <u>Right of First Refusal</u>.  In the event that Licensee wishes to sell all or substantially of its rights under this Agreement, Licensee shall first give Licensor written notice and shall offer Licensor the right to purchase Licensee's rights under this Agreement at a purchase price as shall be mutually agreeable between Licensor and Licensee.  If Licensor and Licensee cannot agree on a mutually acceptable purchase price within sixty (60) days of the date of Licensee's notice to Licensor of its desire to sell or substantially all of its rights under this Agreement, Licensee shall be entitled to entertain bona fide offers from unaffiliated third parties of Licensee to purchase all or substantially all of Licensee's rights under this Agreement.  To the extent that the terms of a bona fide offer which Licensee desires to accept are more favorable to Licensee than Licensor offered to Licensee, Licensee shall be entitled to sell all or substantially all of its rights under this Agreement to the third party purchaser on such terms; provided that any such purchase shall be conditioned upon such purchaser agreeing in writing with Licensor to be bound by the terms of this Agreement, including the intellectual property, quality control and confidentiality provisions.  In the event that within one hundred and eighty (180) days from the expiration of the aforementioned sixty (60) day period, Licensee is unable to obtain a bona fide offer from an unaffiliated third party which Licensor desires to accept and which is on terms more favorable than those offered by Licensor, Licensee shall not be entitled to sell all or substantially all of its rights under this Agreement without first providing Licensor with an opportunity to purchase such rights in accordance with this Section 4.8.  Notice requirements of this Agreement must be provided in writing to:

                For Hwangs to:

                Linda Hwang
                224 Country Club Drive
                Moorestown, NJ 08057

                with a copy to:

                Y. Jae Kim, Esq.

Kim Winston LLP
1307 White Horse Road, Suite 601
Voorhees, NJ 08043

For La Colombe Torrefaction, Inc. to:

La Colombe Torrefaction, Inc.
2620 E. Tioga Street,
Philadelphia, PA 19134

with a copy to:

Steven N. Haas, Esq.
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

Any and all notices, demands or other communications required or permitted to be given hereunder by any party hereto will be in writing and will be deemed to have been validly given or made to another party (i) upon receipt, when delivered personally or dispatched electronically; or (ii) one day after deposit with a nationally recognized overnight delivery service, in each case properly addressed to the party to receive the same.

4.9     In the event Licensor, or its successors or assigns ceases all operations worldwide, excluding South Korea, for a period of at least twenty-four (24) consecutive months, Licensor shall thereupon be deemed to have assigned, sold, transferred and set over to Licensee, its successors and assigns the entire right, title and interest in all Licensed Marks, including trademarks, service marks, trade names, brands, logos, good will and other distinctive identifications in connection with the La Colombe System in the Field of Use within the Licensed Territory in existence at the time Licensor ceases all operations.

4.10    In the event any of the rights granted under Section 4 conflict with any applicable laws of the Licensed Territory so as to abridge any rights conferred, Licensor and its Affiliates shall cooperate fully with Licensee, at Licensor's expense, in all activities necessary to register, secure and/or preserve said rights in the Licensed Territory, including the execution of any new licenses, agreements or contracts to achieve, to the maximum extent permissible, the economic, legal, and commercial intent and objectives of this Agreement.

4.11    Licensee acknowledges that Licensor from time to time supplies products, including Licensed Products, to certain third-parties whose business operations may be conducted in the Licensed Territory as well as in other geographic locations. To the extent any such third parties seek to purchase Licensed Products from Licensor for use in the Licensed Territory, Licensor shall inform said third parties that a sublicense or approval must be obtained from Licensee prior to the fulfillment of any purchase orders for Licensed Product and will direct all

purchase orders to Licensee for fulfillment.

5. TERM

    5.1    The term of this Agreement shall be perpetual, subject to the provisions of Section 14.

    5.2    In the event a court of competent jurisdiction construes the perpetual nature of this Agreement to have a finite term, the term of the Agreement shall be deemed to be 100 years from the Effective Date and renewable upon notice to Licensor of Licensee's intent to renew for another 100 years, subject to the provisions of Section 13.

6. INTELLECTUAL PROPERTY

    6.1    In the event any of the Licensed Marks or other Intellectual Property rights are not registered or procured in the Licensed Territory, Licensor shall have the right, but not the obligation, at its expense, to take all action necessary to register, secure and preserve such rights in the Licensed Territory, including filing for trademarks, patents, copyrights and/or any other intellectual property rights. Licensee shall cooperate fully with Licensor in all activities necessary to register, secure and preserve the Licensed Marks or other Intellectual Property within the Licensed Territory, including executing all papers and instruments to enable Licensee to apply for trademarks, patents, copyrights and/or any other intellectual property asset within the Licensed Territory. In the event that Licensor chooses not to secure protection for a Licensed Mark or other Intellectual Property right in the Licensed Territory, Licensee shall be permitted to do so provided that any such protection be filed in the name of Licensor and Licensor agrees to pay all reasonable attorneys' fees and costs associated with Licensee's efforts under Section 6.1. In such event, Licensor will cooperate fully with Licensee to secure such protection.

    6.2    Licensee acknowledges that certain of the Licensed Marks registered in the Licensed Territory, as designated on Appendix B, are registered in the name of Licensee. Licensee agrees to assign, and hereby assigns, to Licensor all right, title and interest of Licensee in and to such Licensed Marks, including all goodwill associated therewith. Licensee agrees to execute such instruments and documents and take all further action required to effectuate the foregoing assignment, including, without limitation, executing and filing separate assignments, in a form acceptable to Licensor, in the Licensed Territory.

    6.3    Licensor shall use commercially reasonable efforts to maintain and preserve its rights in the Intellectual Property and refrain from taking any action that could reasonably be likely to materially impair any of its rights to the Licensed Marks or Intellectual Property in the Licensed Territory. Licensee shall refrain from taking any action that could be reasonably likely to materially impair any of Licensor's rights to the Licensed Marks or Intellectual Property in the Licensed Territory.

6.4    Infringement.   Licensee agrees to assist Licensor to the extent reasonably necessary to protect the Licensed Marks or other Intellectual Property in the Licensed Territory.  Licensor agrees to reimburse Licensee for its reasonable costs and reasonable attorney's fees in providing such assistance.   Licensee shall immediately notify Licensor of any infringement of the Licensed Marks or Intellectual Property in the Licensed Territory which may come to the Licensee's attention, and Licensor shall have the right to determine whether or not any litigation shall be instituted in connection therewith.   In the event Licensor elects not to pursue litigation or other resolution of an accused infringement brought to its attention by Licensee, Licensee may pursue an action against such accused infringer thirty (30) days after notice to Licensor.  Licensor shall reimburse and pay all of Licensee's reasonable costs and reasonable attorney's fees in connection with such actions.  In that event, Licensee shall be entitled to retain any damages awarded in such an action.   In addition, should Licensee pursue an accused infringement pursuant to this Section, Licensor agrees to assist Licensee to the extent reasonably necessary.

7.    QUALITY CONTROL

7.1    Licensee acknowledges that the maintenance of the high quality of the Licensed Products and the La Colombe System, and the control by Licensor over the nature and quality of all Licensed Products and how the La Colombe System is exploited in the Licensed Territory are material conditions of this Agreement. As a general rule, all packaging, display, presentation and marketing of the Licensed Products, and how the La Colombe System is exploited in the Licensed Territory should be consistent or comparable with the quality in which the Licensed Products are packaged, displayed, presented and marketed and how the La Colombe System is exploited by Licensor in the United States.   Notwithstanding the foregoing, however, Licensor acknowledges that the customs, traditions, business practices and market in the Licensed Territory may differ from that of the United States and that reasonable accommodation by Licensee in how the La Colombe System is exploited by Licensee in the Licensed Territory to account for these differences (for example, the size and décor of any retail cafés), or other accommodations otherwise agreed to in writing by Licensor, shall not be considered a violation of this Section 7.1.  Without limiting the foregoing, the quality of all sales of coffee and related beverages in retail cafes and similar establishment shall be consistent or substantially equivalent with the standards imposed by Licensor in its other café's and establishments, and Licensor shall provide Licensee with such manuals and other materials as is generally provided to other café operators to ensure consistency with such standards, and to the extent Licensor prepares and distributes other written quality control standards to other licensee of Licensed Products or the La Colombe System, it shall provide such written standards to Licensee.

7.2    Licensor shall have the right, on an annual basis and with reasonable notice, to conduct an on-site inspection within the Licensed Territory of Licensee's goods and services, including any cafes or other similar establishments, marketing or

promotional materials, bearing the Licensed Marks to ensure that Licensee is in compliance with the quality control standards required under Section 7.1. In the event Licensor believes in good faith that Licensee is not offering goods or services in compliance with the quality control standards, then Licensor shall provide written notice to Licensee and work with Licensee to diligently and in good faith to ensure that any deficiencies are remedied. In the event such deficiencies are not remedied to the reasonable satisfaction of Licensor within ninety (90) days despite diligent and good faith efforts by both parties, Licensee shall be obligated to suspend those activities which remain out of compliance with the quality control standards until compliance with such standards are again met to the reasonable satisfaction of Licensor, but Licensee shall be entitled to continue to engage in other activities permitted under this Agreement to the extent in compliance with the quality control standards.

7.3     Licensee shall, at its own cost and expense, submit to Licensor for approval upon Licensor's request, not more than once each year during the Term, a sample of each Licensed Product and all tags, labels and packaging associated with Licensed Products and La Colombe System. Licensee shall also, at its own cost and expense, and at upon Licensor's request, submit to Licensor for approval copies of all advertisements or promotional materials containing the Licensed Marks or Intellectual Property. All matters requiring the approval of Licensor shall be deemed approved unless a written notice of disapproval is provided within sixty (60) days from its submission to Licensor with an explanation as to how the sample or copy is detrimental to the applicable Licensed Mark. Approval by Licensor shall not to be unreasonably withheld.

## 8.     GENERAL SERVICES OF LICENSOR

8.1     Licensor shall advise and consult with Licensee periodically in connection with the operations of cafes, roasting operations, and distribution operations upon the request of Licensee, as well as communicate and provide to Licensee its know-how, new developments, techniques and improvements in all areas of its or its Affiliates' businesses, including but not limited to, cafe operations, coffee roasting operations, and distribution operations. The communications may be accomplished by visits of La Colombe personnel, printed or electronic reports, seminars, training sessions, or other similar means customarily used in the trade or industry. Licensor shall also make available to Licensee for training purposes all additional services, rights and privileges from time to time upon reasonable notice from Licensee, but at License's cost.

8.2     At Licensor's cost for travel and at Licensee's cost for food and accommodations, Licensor, at Licensee's reasonable request, shall provide on-site training to Licensee and its employees by Todd Carmichael and/or Jean Philippe Iberti or by Steve Steinruck, Tobin Bickley or Nicolas O'Connell upon startup of coffee roasting operations by Licensee within the Licensed Territory (but not more than once per year during the Term), so long as Todd Carmichael and/or Jean Philippe Iberti are employed by Licensor or retains an ownership interest in La Colombe or

any of its affiliates or otherwise prevented by acts of God. Without limiting anything in this Agreement to the contrary, in the event Licensee sublicenses the right to roast coffee, Licensee shall cooperate with Licensor to ensure the maintenance of consistency of the roasting process and the resulting coffee with the standards imposed by Licensor in its own roasting process.

8.3     Licensor shall provide Licensee with a copy set of all its business manuals, operations manuals, and quality control procedures, if any, relating to the La Colombe System and Licensed Products, and copies of any updates to such manuals within a reasonable time after issuance of such manuals and updates, but no later than three (3) months from issuance. Licensee shall maintain the confidentiality of such materials.

8.4     Licensor shall provide Licensee with training, including on-site training, related to the La Colombe System by Todd Carmichael, Jean Philippe Iberti, Steve Steinruck, Tobin Bickley or Nicolas O'Connell, within a reasonable time upon request from Licensee (but not more than once per year during the Term). This training shall be provided at Licensee's cost.

9.    <u>PERFORMANCE</u>

9.1     Licensor shall use commercially reasonable efforts to monitor the activities of third parties, including other licensees who may be conducting business within the Licensed Territory. In the event any third party is found to be conducting business in the Licensed Territory such that it can reasonably be considered a violation of Licensee's rights under this Agreement, Licensee shall have the right, but not the obligation, to take all necessary action, including initiating legal action, to address such actions. Licensee shall provide notice to Licensor of such actions and Licensor agrees to reimburse Licensee for all reasonable attorneys' fees and costs associated with such actions. In the event, however, any such action by third parties would constitute and infringement or alleged infringement of Intellectual Property, than the terms of Section 6.3 shall apply in lieu hereof.

9.2     Licensor shall supply Licensed Products to Licensee at the following cost schedule which shall be established once annually on January 30th of each calendar year or as new product(s) are first released to market. Licensee shall pay all invoices for Licensed Products within ninety (90) days after delivery. Delivery terms will be the same as those currently in practice between the Parties. Licensor shall provide to Licensee copies of written records of information reasonably requested by Licensee to confirm cost of goods for Licensee under this Agreement, all of which information shall remain confidential.

(a)     <u>Coffee</u>: The cost of Coffee goods to Licensee shall be the lowest distributor pricing that Licensor makes available for or offers to any other distributor anywhere worldwide. At Licensee's request not more than once each calendar quarter, Licensor shall provide Licensee with its wholesale pricing list.

(b) <u>All Other Goods</u>. The cost of all other Licensed Products to Licensee shall be the manufacturing cost incurred by Licensor or any of its Affiliates. At Licensee's request not more than once each calendar quarter, Licensor shall provide Licensee with a vendor pricing list or vendor invoices.

9.3 <u>October 15, 2010 License</u>. The Parties agree that the 2010 License shall terminate upon the execution and delivery of this Agreement.

10. <u>NON-COMPETITION</u>

10.1 During the Term of this Agreement, La Colombe and its Affiliates shall not, directly or indirectly, without the prior written consent of Licensee engage in any activity or business operation, including importation and exportation, related to, arising out of, or in connection with Coffee, the Licensed Marks, the Intellectual Property, or the La Colombe System, within the Licensed Territory, or invest in any business that directly or indirectly competes with Licensee's activities under this Agreement within the Licensed Territory.

11. <u>DISTRIBUTION RIGHTS</u>

11.1 Licensor grants to Licensee an exclusive and perpetual license and right to import and distribute retail and wholesale Licensed Products within the Licensed Territory.

11.2 Licensor hereby agrees that it will not ship or sell or offer for sale, either directly or through any other third party other than Licensee, any Licensed Products within the Licensed Territory, without the express written consent of Licensee. Licensor will refer to Licensee any and all orders or inquiries for Licensed Products that it may receive for shipment to the Licensed Territory, or orders which are intended for eventual shipment to the Licensed Territory.

11.3 Licensor will use its best efforts to fill promptly and to the best of its ability all orders for the Licensed Products received from Licensee.

11.4 <u>Cost of Goods</u>: As per Section 9.2.

11.5 <u>Payment and Delivery Terms</u>: As per Section 9.2.

12. <u>OWNERSHIP</u>

12.1 Licensee acknowledges that Licensor is the sole and exclusive owner of all right, title and interest in and to the Intellectual Property in the Licensed Territory, as well as to all combinations, forms and derivatives thereof which may hereafter be approved by Licensor for use by Licensee hereunder in the Licensed Territory. Licensee acknowledges the substantial value and eminent goodwill associated with the Intellectual Property and the exclusive ownership thereof by Licensor, and agrees not to, at any time (either during the term of this License or thereafter), directly or indirectly, do or suffer to be done any act or thing could reasonably be expected to adversely affect any rights of Licensor in and to any of such marks, any registrations thereof or any applications for registration thereof, or which could reasonably be expected to reduce the value thereof or detract from their reputation, image or prestige or that of Licensor or the Intellectual Property.

13. TERMINATION

13.1 This Agreement, excluding the rights conferred under section 4, shall terminate only pursuant to the following terms:

(a) Licensee ceases to conduct any business or operations within the Licensed Territory in connection with the Field of Use for a period of at least twenty-four (24) consecutive months and ceases all distribution operations and use of the Licensed Marks and Licensed Products within the Licensed Territory for a period of at least twenty-four (24) consecutive months; or

(b) Licensee breaches any material provision of this Agreement, (including but not limited to the Quality Control provisions under Section 7, but subject to the remedial provision in Section 7.2) and Licensee does not cure such breach to Licensor's reasonable satisfaction following ninety (90) days written notice to Licensee; provided, however, that if the breach is not cured within such ninety (90) day period, but is still capable of being remedied, and provided that Licensee continues to exercise commercially diligent efforts to remedy the breach, Licensor shall not be entitled to terminate the Agreement unless the breach is not remedied within two hundred (200) days from the expiration of the date initial notice of the breach is given to Licensee. Licensor shall give Licensee prompt written notice of any breach of any material provision of this Agreement upon discovery thereof, and Licensee shall give Licensor prompt written notice upon its discovery of any breach of any material provision hereof. In the event Licensor fails to provide the aforementioned notice within one (1) year of its discovery of the breach, Licensor shall not be entitled to terminate this Agreement under this Section 14(b) on account of such breach but Licensee covenants to use commercially diligent efforts to remedy such breach. Licensor shall promptly notify Licensee of its reasonable determination that any breach of which it has

previously notified Licensee has been cured or any efforts to cure the breach fails to cure the breach to the Licensor's reasonable satisfaction.

14.    EFFECT OF TERMINATION

14.1    Upon termination of this Agreement, Licensee shall cease and desist, within a reasonable time to be agreed upon by Licensee and Licensor, from all further use of the Licensed Marks, the La Colombe System and all other Intellectual Property. Licensee further agrees that upon termination of this Agreement Licensee will not thereafter use any mark that incorporates the Licensed Marks, or any mark that is confusingly similar to the Licensed Marks, nor will Licensee challenge the ownership or validity of, or seek to cancel, the Licensed Marks or any other trademark of Licensor.

14.2    Upon the expiration of the Agreement, Licensee shall immediately deliver to Licensor a complete and accurate inventory of Licensed Products. Licensee may dispose of the Licensed Products during the period agreed upon by the parties under this Agreement, provided however, that such disposition shall continue to be subject to Licensee's obligations hereunder, including, without limitation, with respect to the quality control provisions. At the end of the agreed-upon disposal period, or if none, upon termination, any Licensed Products remaining in Licensee's possession or control shall, at the request of Licensor, and at Licensee's expense, be destroyed. Licensor shall have the right at any time to conduct a physical inventory of the Licensed Products then in Licensee's possession or control.

14.3    Upon the termination or expiration of this Agreement, Licensee will be deemed to have assigned, transferred and conveyed to Licensor any trade rights, equities, goodwill, titles or other rights in and to the Licensed Marks and all other Intellectual Property, and any assumed business name incorporating the Licensed Marks which may have been obtained by Licensee or which may have vested in Licensee in pursuance of any endeavors covered hereby, and that Licensee shall execute any instrument requested by Licensor to accomplish or confirm the foregoing. Any such assignment, transfer or conveyance shall be without consideration other than the mutual covenants and considerations of this Agreement.

15.    REPRESENTATIONS AND WARRANTIES AND INDEMNITIES

15.1    Licensor represents and warrants that it is the sole and exclusive owner of all right, title and interest in the Licensed Marks and Intellectual Property.

15.2    Licensor represents, warrants and covenants that it has the full right and authority to enter into this Agreement and grant the rights and licenses conferred herein and that it has not previously granted and will not grant rights or licenses in conflict with the rights and licenses granted herein.

15.3 Licensor shall indemnify Licensee, its owners, officers, employees, successors and assigns from and against all liability, demands, damages, expenses and losses, for any claim that the Licensed Marks or the Intellectual Property infringe the intellectual property rights of any third party provided that Licensee is in compliance with all of the terms and conditions of this Agreement.

15.4 Licensor represents, warrants and covenants that it is not aware of any intellectual property right(s) of others whereby the use of said Intellectual Property and Licensed Trademarks within the Licensed Territory could reasonably be considered an infringement thereof.

15.5 Licensor represents, warrants and covenants that it is not aware of any intellectual property right(s) of others, information or reason that could reasonably be considered to abridge the rights conferred to Licensee under this Agreement.

15.6 Licensee shall defend, indemnify, and hold harmless Licensor, its officers, employees, and agents from and against any losses and expenses (including attorneys' fees), claims, suits, or other liability, including product liability, resulting from injury to or death of any person or damage to property arising out of or in any way connected with the exercise of the license or sublicense granted by this License Agreement, provided such injuries to persons or damage to property are due to the acts of commission or omission of Licensee or any Sublicensee, their officers, employees or agents, or the products manufactured or sold by them. Licensee shall, during the term of this Agreement obtain and maintain at its own cost and expense insurance coverage for both bodily injury and property damage liability, including products and complete operations liability, foreign liability, personal injury and advertising coverage. This policy shall name Licensor as an additional insured insofar as this Agreement is concerned.

16. GENERAL PROVISIONS

16.1 The Parties agree that this Agreement shall inure to the benefit of and be binding upon each of their respective executors, administrators, heirs, permitted assigns, successors in interest, agents, representatives, shareholders, offices, directors, subsidiaries, insurers, and predecessors or successor companies. The Parties agree that this Agreement shall inure to the benefit of and be binding upon each of their respective executors, administrators, heirs, permitted assigns, successors in interest, agents, representatives, shareholders, offices, directors, subsidiaries, insurers, and predecessors or successor companies. Subject to Section 4.8, this Agreement shall not be transferable or assignable by Licensee without the express written consent of Licensor, which shall not be unreasonably withheld; provided that any transferee or assignee shall be obligated to agree in writing with Licensor to be bound by the terms of this Agreement, including the intellectual property, quality control and confidentiality provision.

16.2 This Agreement may not be modified except by written agreement signed by both

the Licensor and the Licensee.

16.3    In the event that any provision of this Agreement is held to be void or unenforceable by a court of competent jurisdiction, such finding shall not be construed to render any other provision of this Agreement either void or unenforceable, and all other provisions shall remain in full force and effect. Upon any such determination, the Parties shall make such amendments to this Agreement as necessary to remove the invalid or unenforceable part of any such provision but otherwise achieve, to the maximum extent permissible, the economic, legal, and commercial intent and objectives of the original provision.

16.4    Notwithstanding the other provisions of this Agreement, in the event that, pursuant to the applicable bankruptcy law, a third party is permitted to assume this Agreement, such third party must notify Licensor in writing of its interest in assuming this Agreement and of its proposed terms for doing so. Upon receipt of such notice, Licensor shall have fifteen (15) days to approve the assumption and the terms therefor. If Licensor fails to approve the assumption within said fifteen (15) days, the third party may complete the assignment referred to in its notice upon the terms specified therein. Nothing contained herein shall be deemed to preclude or impair any rights which Licensor may have as a creditor in any bankruptcy proceeding.

16.5    This Agreement constitutes the entire agreement between the Parties and supersedes any and all prior agreements or understandings, written or oral, between them relating to the subject matter of this Agreement.

16.6    This Agreement may be executed in counterparts and transmitted by email or facsimile, each of which shall constitute a duplicate original.

16.7    This Agreement and the relationship of the parties shall be governed, interpreted and construed in accordance with applicable laws of the Commonwealth of Pennsylvania without regard to conflicts of law principles.

16.8    Except as set forth in Section 16.9 below, Licensor and Licensee agree that any action brought by one of them against the other must be instituted in a state or federal court having subject matter jurisdiction thereof located in or for Philadelphia County, Philadelphia, Pennsylvania, and they irrevocably waive any objection they may have to the jurisdiction or the venue of such courts.

16.9    The Parties acknowledge that a breach of the terms, covenants or conditions contained in this Agreement by any of them will cause irreparable damage to the other for which a remedy at law would not be adequate. In the event of such breach or threatened breach, the non-breaching Party shall be entitled to seek appropriate injunctive relief in any court of competent jurisdiction, including any such court in the Licensed Territory, restraining the breaching party and its employees from any such threatened or actual violation of the provisions of this Agreement. This provision does not limit a non-breaching party's rights to seek

monetary damages in addition to injunctive relief. However, no party shall be liable for indirect, incidental or consequential, or punitive damages, including, but not limited to, any claim for lost profits, of any nature or kind resulting from or arising in connection with this Agreement. In the event of a breach of any provision of this Agreement other than the Quality Control provisions of Paragraph 7, Licensor agrees that it will not suspend the shipment of any Licensed Products until Licensor exercises its right to terminate this Agreement pursuant to Section 13 hereof. In the event, however, that Licensee breaches the Quality Control provisions of Paragraph 7 of this Agreement, Licensor reserves the right to suspend shipment of those Licensed Products associated with Licensee's activities which are not in compliance with the requisite quality control standards.

16.10   Failure or delay by either Party in exercising or enforcing any provision, right, or remedy under this Agreement shall not be deemed a waiver thereof, nor shall a waiver by either Party in one or more instances be construed as constituting a continuing waiver or as a waiver in other instances, nor prevent the subsequent exercise of that or any other right or remedy.

16.11   The Parties acknowledge that the terms of this Agreement are contractual and are the result of negotiations between the Parties and their counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. This Agreement shall not be construed against any party as if that party had drafted it.

16.12   In the event any dispute or legal proceeding is commenced by Licensor against Licensee to interpret, enforce, in connection with or arising out of this Agreement, Licensor shall pay Licensee's reasonable attorneys' fees and costs in connection with the dispute or legal proceeding for any issue(s) and/or matter(s) that are settled, or ruled in favor of Licensee by a court of competent jurisdiction. Licensor also agrees to continue supplying Licensed Products pursuant to the terms of this Agreement during any such dispute or legal proceeding action until such time as said dispute and/or legal proceeding has concluded. This provision shall survive termination of this Agreement.

16.13   In the event any dispute or legal proceeding is commenced by Licensee against Licensor to interpret, enforce, in connection with or arising out of this Agreement, Licensee shall pay Licensor's reasonable attorneys' fees and costs in connection with the dispute or legal proceeding for any issue(s) and/or matter(s) that are settled, or ruled in favor of Licensor by a court of competent jurisdiction. This provision shall survive termination of this Agreement.

16.14   Licensor agrees that it will at all times refrain from taking any action or making any statements which disparage the goodwill or the reputation of Licensee, including its successors and assigns, partners, associates, employees and counsel.

16.15   Sections 14, 15 and 16 shall survive termination of the Agreement.

**[SIGNATURE PAGE IMMEDIATELY FOLLOWS]**

**IN WITNESS WHEREOF**, the Parties, each intending to be legally bound by the terms of this Agreement, have caused this Agreement to be executed as of the Effective Date.

**LICENSOR**

**La Colombe/Torrefaction, Inc.**

_____       _____
Todd Carmichael, CEO                            Date

_____       _____
Jean Philippe Iberti, President                  Date

**IN WITNESS WHEREOF**, the Parties, each intending to be legally bound by the terms of this Agreement, have caused this Agreement to be executed as of the Effective Date.

**LICENSOR**

**La Colombe Torrefaction, Inc.**

_____     _____
Todd Carmichael, CEO                                          Date

_____     _____
Jean Philippe Berti, President                               Date

**LICENSEE**

_____     _____
Myung Kee Hwang                      Date

_____     _____
Linda Hwang                          Date

# APPENDIX A

<u>October 15, 2010 License Agreement</u>

## APPENDIX B

## La Colombe Trademarks

| Mark | Registration/Serial No. | Country |
|---|---|---|
| LA COLOMBE TORREFACTION and Design | 4102011870000[1] | Republic of Korea |
| LA COLOMBE TORREFACTION and Design | 4010302250000[2] | Republic of Korea |
| LA COLOMBE TORREFACTION and Design | 4009173180000[3] | Republic of Korea |
| LA COLOMBE COFFEE ROASTERS | 85880769 | US |
| LA COLOMBE | 74642354 | US |
| LA COLOMBE TORREFACTION | 2349181 | US |
| BIKES TO RWANDA | 4345639 | US |
| FIVE DEGREES | 4040930 | US |
| FIVE DEGREES | 3981666 | US |
| FIGURE OF FLYING DOVE WITH TWIG | 4497085 | US |
| 5 PRINCIPALS & DESIGN | 85880753 | US |
| STRICTLY EARTH CONSCIOUS & DESIGN | 85880782 | US |
| FARM ASSIST & DESIGN | 85880798 | US |
| LA COLOMBE COFFEE ROASTERS | 86343424 | US |
| LA COLOMBE COFFEE ROASTERS | 86322470 | US |
| LA COLOMBE | 86321651 | US |

[1]     Trademark currently registered in the name of Todd Carmichael. To be assigned to Licensor.
[2]     Trademark currently registered in the name of Myung kee Hwang. To be assigned to Licensor.
[3]     Trademark currently registered in the name of Myung kee Hwang. To be assigned to Licensor.

| | | |
|---|---|---|
| TORREFACTION | | |
| LA COLOMBE TORREFACTION | 86321634 | US |
| LA COLOMBE | 86324848 | US |
| LA COLOMBE COFFEE ROASTERS | 86321699 | US |
| LA COLOMBE TORREFACTION | 86321664 | US |

# APPENDIX C

## Intellectual Property Listing

<u>Patent Properties</u>

<u>None</u>
<u>Copyright Properties</u>

<u>None</u>

<u>Other IP Properties</u>

None

<u>Trademark Properties</u>

See Appendix B