# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HWANG, *et al.*,** *Plaintiffs*, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 25-5351** |
| | : | |
| **LA COLOMBE TORREFACTION, INC. *et al.*,** *Defendants*. | : | |

NITZA I. QUINONES ALEJANDRO SEPTEMBER 3, 2026

## MEMORANDUM OPINION

### INTRODUCTION

Plaintiffs Myung Kee Hwang and Linda Hwang, ("Plaintiffs"), filed this commercial action against their licensor, Defendants La Colombe Torrefaction, Inc. and LCT OPCO LLC d/b/a "La Colombe" ("Defendants" or "La Colombe"), pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"). (ECF 1). In their complaint, Plaintiffs aver that they are the exclusive licensees of Defendants' intellectual property rights in the Republic of Korea ("Licensed Territory" or "South Korea"), and that Defendants violated the terms of their exclusive license agreement by (1) refusing to provide information to which Plaintiffs' are contractually entitled and (2) engaging in commercial activity with a competing business in Plaintiffs' Licensed Territory. (*Id.*). Specifically, Plaintiffs assert a state law breach of contract claim and a DTSA misappropriation claim. (*Id.*).

Presently, before this Court are Defendants' motion to dismiss Plaintiffs' complaint, filed pursuant to Federal Rule of Civil Procedure, ("Rule"), 12(b)(6) on procedural and substantive grounds, (ECF 11); Plaintiffs' response in opposition to Defendants' motion to dismiss, (ECF 20);

and Defendants' reply, (ECF 21). For the reasons set forth herein, Defendants' motion to dismiss is denied.

**BACKGROUND**

When ruling on a defendant's motion to dismiss, this Court accepts as true all well-pled factual allegations in the complaint. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Briefly, the alleged facts relevant to Defendants' motion to dismiss are as follows:

> In 1994, La Colombe was founded by Todd Carmichael and Jean Phillipe Iberti in Philadelphia, PA. (ECF 1 at ¶ 15). That same year, Plaintiffs' interest in the Defendants began when they were introduced to the Defendants' coffee products and established business relationships with the co-founders and officers of the Defendants, including the previously mentioned founders and the Chief Operating Officer Tobin Bickley. (*Id*. at ¶ 16). Plaintiffs contend that in 2010, Defendants were struggling to meet their financial needs to expand their business and, as a result, the Plaintiffs invested substantial monies to assist Defendants. (*Id*. at ¶ 17). During this period, the Plaintiffs obtained a minority ownership interest in the Defendants. (*Id*. at ¶ 17).
>
> In addition to their minority ownership stake in the Defendants' business, Plaintiffs were granted an exclusive license ("the 2010 Exclusive License Agreement") with the Defendants which, *inter alia*, granted Plaintiffs exclusive rights to operate one or more businesses using the Defendants' trademarks, service names, trade names, brand, logos, and other distinctive identifications, in Asia. (*Id*. at ¶ 18). Plaintiffs contend that among the rights licensed was the right to distribute the line of Defendants' products in all of Asia. (*Id*. at ¶ 18). In 2014, the 2010 Exclusive License Agreement was renegotiated and replaced by the 2014 Exclusive License and Distribution Agreement ("the 2014 Exclusive License Agreement") for South Korea. (*Id*. at ¶ 20; *see also* Ex. 1, ECF 1-1). Since 2014, Plaintiffs contend they have operated businesses in South Korea pursuant to the License Agreements and have conducted business development activities to exploit and sublicense their rights in South Korea. (*Id*. at ¶ 21).
>
> The 2014 Exclusive License Agreement grants the Plaintiffs "an exclusive, fully paid, royalty-free and perpetual right, license and privilege to use the La Colombe System, the Licensed Marks and the Intellectual Property within the Field of Use in [South Korea.]" (Ex. 1, ECF 1-1 at ¶ 4.1; *see also* ECF 1 at ¶ 22). The 2014 License Agreement defines the La Colombe System as "operation of retail coffee shops and coffee roasting operations under a proprietary operating system . . . including the Licensed Marks, designs and color schemes for coffee shops, signs, equipment layouts, formulas and specifications for certain food products, roasting of coffee, methods of inventors and operation control, bookkeeping and

accounting and manuals covering business practices and policies, and general business and distribution operations." (Ex. 1, ECF 1-1 at ¶¶ 1.1, 3.8; *see also* ECF 1 at ¶ 23). The License Agreement also defines the Licensed Marks as "trademarks, service marks, trade names, brands, logos and other distinctive identifications, owned by La Colombe or its Affiliates, used in connection with the La Colombe System and/or owned by La Colombe or its Affiliates currently in existence or to be created and owned by La Colombe or its Affiliates[.]" (Ex. 1, ECF 1-1 at ¶ 3.2; *see also* ECF 1 at ¶ 24).

Under the License Agreement, La Colombe is obligated to "provide Licensee with such manuals and other materials as is generally provided to other café operators to ensure consistency with such standards, and to the extent Licensor prepares and distributes other written quality control standards to other licensee[s] of Licensed Products or the La Colombe System, it shall provide such written standards to Licensee." (Ex. 1, ECF 1-1 at ¶ 7.1; *see also* ECF 1 at ¶ 25). La Colombe is also obligated to "communicate and provide to Licensee its know-how, new developments, techniques and improvements in all areas of its or its Affiliates' businesses, including but not limited to, café operations, coffee roasting operations, and distribution operations" and to "provide Licensee with a copy set of all its business manuals, operations manuals, and quality control procedures." (Ex. 1, ECF 1-1 at ¶¶ 8.1 and 8.3; *see also* ECF 1 at ¶ 26). The License Agreement further includes the obligation that, "[a]t Licensee's request not more than once each calendar quarter, Licensor shall provide Licensee with its wholesale pricing list" for coffee goods. (Ex. 1, ECF 1-1 at ¶ 9.2(a); *see also* ECF 1 at ¶ 27). The License Agreement further includes a provision that La Colombe and its Affiliates "shall not, directly or indirectly, without the prior written consent of Licensee engage in any activity or business operation, including importation and exportation, related to, arising out of, or in connection with Coffee, the Licensed Marks, the Intellectual Property, or the La Colombe System, within the Licensed Territory, or invest in any business that directly or indirectly competes with Licensee's activities under this Agreement within the Licensed Territory." (Ex. 1, ECF 1-1 at ¶ 10.1; *see also* ECF 1 at ¶ 28).

In 2014, Ralph's Coffee was started in New York City and is owned and operated by Ralph Lauren. (*Id.* at ¶ 31). Plaintiffs aver that, since its inception, Ralph's Coffee has expanded its retail locations globally, including in Seoul, South Korea. (*Id.*). The website for Ralph's Coffee confirms that Ralph's Coffee has partnered with La Colombe to sell La Colombe roasted coffee. (Ex. 2, ECF 1-2; *see also* ECF 1 at ¶ 31). In late 2024, Plaintiffs became aware of Ralph's Coffee operating retail stores in Seoul, South Korea. (*Id.* at ¶ 32). The website for Ralph's Coffee confirms that in late 2024, Ralph's Coffee operated at least one retail store in Seoul. On September 28, 2024, Plaintiff Mrs. Hwang received information from Janet Kim, a former employee of La Colombe, that La Colombe was heavily involved in establishing Ralph's Coffee, from coffee selection and product development to packaging and label design. (*Id.* at ¶ 33). Plaintiff Mrs. Hwang later received confirmation from Mr. Bickley that La Colombe had a Supply and

Service Agreement with Ralph's Coffee, which included provisions regarding products and services, including design, equipment, and consultation. (*Id.*).

On October 31, 2024, Plaintiffs, through their counsel, wrote to Defendants to inform Defendants of a potential infringement upon Plaintiffs' intellectual property rights in South Korea by Ralph's Coffee. (Id. at ¶ 34). In their letter, Plaintiffs also requested copies of business manuals, operations manuals, and quality control procedures related to the La Colombe System and products pursuant to ¶ 8.3 of the 2014 License Agreement. (*Id.*). Plaintiffs allege that they never received a substantive response from La Colombe regarding the October 31, 2024, request for information pursuant to the License. (*Id.*). On February 18, 2025, Plaintiffs assert that Plaintiff Mrs. Hwang received a phone call from Frank Eden, the Senior Vice President of Wholesale at La Colombe, who informed her that La Colombe would never provide any information related to La Colombe's canned coffee products to the Plaintiffs, and that the Draft Latte canned coffee beverages were not a product covered by the License. (*Id.* at ¶ 35).

Plaintiffs assert that they followed up with Mr. Eden on March 14, 2025, to again request documentation necessary to address their concerns about Ralph's Coffee utilizing the La Colombe System in South Korea. (*Id.* at ¶ 36). Plaintiffs also requested (1) documentation to demonstrate that La Colombe informed Ralph's Coffee about the Hwang's License; (2) information related to La Colombe's Draft Latte canned coffee beverage products, including recipe and manufacturing details; (3) packaging information for the 12 oz. container of coffee beans, including artwork and the vendor La Colombe uses in the United States for cardboard packaging and vinyl bases; (4) wholesale distributor pricing for coffee beans and Draft Latte cans; and (5) La Colombe's business manuals, operations manuals, and quality control procedures ("Information Requests"). (*Id.*). Plaintiffs assert that La Colombe has refused to comply with any of their information requests. (*Id.* at ¶ 37). Plaintiffs assert that Defendant responded in writing to the Plaintiffs' March 14, 2025 letter by expressly denying that La Colombe's Draft Latte drinks are covered by the 2014 Exclusive License Agreement. (*Id.*). Plaintiffs assert that additional requests were made on April 16, 2025, and thereafter, and that numerous letters were exchanged by their counsel. (*Id.* at ¶ 41).

**STANDARD OF REVIEW**

When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), the "Court must accept all of the complaint's well-pleaded facts as true but may disregard any legal conclusions." *Fowler*, 578 F.3d at 210-11. The "Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id*. at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The complaint must do more

than merely allege the plaintiff's entitlement to relief; it must "show such an entitlement with its facts." *Id*. (internal quotation marks and citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a) (alteration in original)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id*.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts sufficient to "'nudge [his or her] claims across the line from conceivable to plausible.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 570) (alteration in original). When ruling on "a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint[,] . . . matters of public record[,]" and "undisputedly authentic document[s] that a defendant attaches as an exhibit . . . if the plaintiff's claims are based on the document[s]." *Pension Ben. Guar. Cop. v. White Consol. Ind., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (internal citations omitted). Courts "may consider documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (internal quotation marks and citations omitted) (alteration in original). However, "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022).

**DISCUSSION**

As noted, Plaintiffs raise the following claims against Defendants; *to wit*: (1) breach of contract (Count I); and (2) trade secret misappropriation pursuant to the DTSA (Count II). In their motion to dismiss, Defendants argue that Plaintiffs fail to state any claim upon which relief can be granted. Plaintiffs disagree. Each claim will be addressed in turn.

***I. Plaintiffs' Breach of Contract Claim (Count I)***

Defendants argue that Plaintiffs' breach of contract claim fails because Plaintiffs have not pleaded any plausible theory of breach. Defendants further argue that, even if Plaintiffs had pleaded a plausible theory of breach, Plaintiffs' claims fail, as a matter of law, based on contested facts established by documents enclosed in Defendants' motion to dismiss. Plaintiffs counter that their complaint pleads multiple plausible theories of contractual breach and argue that Defendants' improper attempts to refute the allegations in the complaint with extraneous documents should be disregarded.

"Under Pennsylvania law, '[a] breach of contract action involves: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages.'" *Burton v. Teleflex Inc.*, 707 F.3d 417, 431 (3d Cir. 2013) (quoting *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 896 (Pa. Super. Ct. 2011)) (alteration in original). "A breach of contract is the non-performance of a contractual duty or violation of such an obligation." *In re Spagnol Ent., Inc.*, 81 B.R. 337, 353 (W.D. Pa. 1987). For purposes of this motion, the parties dispute the second element.

Here, Plaintiffs aver that Defendants' conduct breached various provisions of the Exclusive License Agreement between the parties, including paragraph 8.3, (ECF 1 at ¶ 55(1)), paragraph 8.1, (*id*. at ¶ 55(3)), paragraph 9.2(a), (*id*. at ¶ 55(4)), and paragraph 10.1, (*id*. at ¶ 55(5)).

Specifically, Plaintiffs aver that Defendants breached paragraph 8.3 by withholding and refusing to provide information requested in their various information requests and owed to the Hwangs, such as business manuals, operations manuals, and quality control procedures related to the La Colombe System and Products.. Paragraph 8.3 provides, in relevant part, that Defendants are obligated to "provide Licensee with a copy set of all its business manuals, operations manuals, and quality control procedures." (Ex. 1, ECF 1-1 at ¶¶ 8.1, 8.3; *see also* ECF 1 at ¶ 26). Plaintiffs' averment that they were not provided with this information upon request is a plausible violation of Defendants' obligations under the 2014 Exclusive License Agreement.

Plaintiffs also aver that Defendants breached paragraph 10.1 by investing substantial resources to assist in the development and establishment of Ralph's Coffee. Plaintiffs support this claim by providing factual assertions and documentation of Defendants' ongoing business relationship with Ralph's Coffee, which has a location in Seoul, South Korea. Paragraph 10.1 provides, in relevant part, that La Colombe and its Affiliates "shall not . . . without the prior written consent of Licensee . . . invest in any business that directly or indirectly competes with Licensee's activities under this Agreement within the Licensed Territory[.]" Plaintiffs' averments that Defendants' have an ongoing documented business relationship with Ralph's Coffee that conducts business in the Licensed Territory state a plausible violation of Defendants' obligations under 2014 Exclusive License Agreement.

Defendants, however, request this Court consider pre-suit correspondence, presented with their motion to dismiss, as foreclosing any factual inference that they plausibly breached any of the provisions cited by Plaintiffs in their complaint. However, Defendants are incorporating these exhibits for the truth of the matter that they assert. This Court declines this request, as such factual disputes are better resolved at later stages of litigation. *See Doe*, 30 F.4th at 342 ("The proper

place to resolve factual disputes is not on a motion to dismiss, but on a motion for summary judgment," (quoting *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 175–76 & n.9 (3d Cir. 2015)). As such, because this Court must accept the facts as true and in the light favorable to the nonmovant in this early stage of litigation, this Court finds that Plaintiffs' complaint contains sufficient factual allegations to plausible plead a breach of contract claim.

***II. Plaintiffs' Misappropriation Claim under the Defend Trade Secrets Act ("DTSA") (Count II)***

Defendant argues that Plaintiffs' DTSA claim fails, as a matter of law, because Defendant cannot misappropriate its own trade secrets under the DTSA or, alternatively, because Plaintiffs have pled insufficient facts to show misappropriation of the La Colombe Trade Secrets in the Licensed Territory. In their response, Plaintiffs counter that owners of trade secrets can, in fact, be held liable for misappropriating jointly owned trade secrets under the DTSA and that the complaint sufficiently pleads Defendants' misappropriation.

To state a claim for trade secret misappropriation under the DTSA, a plaintiff must allege: (1) the existence of a protectable trade secret; (2) that the trade secret relates to a product or service used in or intended for use in interstate or foreign commerce; and (3) the misappropriation of that trade secret. *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (citing 18 U.S.C. §§ 1836-1839). For purposes of Defendants' motion, the parties dispute only the third element. The DTSA provides "misappropriation" as "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret . . . " 18 U.S.C. § 1839(5)(B)(ii)(II).

Under the DTSA, "[a]n owner of a trade secret that is misappropriated may bring a civil action[.]" 18 U.S.C. § 1836(b)(1). The DTSA defines an owner as "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed[.]" *Id*. § 1839(4). As such, "[t]he DTSA clearly states that an entity that has a 'license in' a trade secret is an owner of a trade secret." *Biohaven Therapeutics Ltd. v. Avilar Therapeutics, Inc*., 2025 WL 2443517, *12 (D. Del. May 1, 2025) (citing 18 U.S.C. § 1839(4)). "[T]rade secrets can be jointly owned and, in fact, a joint owner can bring a claim for trade secret misappropriation against the other owner." *Genesis 1 Oil Servs. LLC v. Wismann Grp., LLC*, 2021 WL 1110594, at *5 (C.D. Cal. Mar. 23, 2021), (internal quotation marks and citations omitted) (quoting *StrikePoint Trading, LLC v. Sabolyk*, No. SACV 07-1073-DOC-MLGx, 2008 WL 11334084, at *6 (C.D. Cal. Dec. 22, 2008), *order dissolved*, No. 820CV02114SSSADSX, 2023 WL 3040584 (C.D. Cal. Mar. 20, 2023), *aff'd*, No. 23-55060, 2024 WL 385655 (9th Cir. Feb. 1, 2024); *cf. RoadRunner Recycling, Inc. v. Recycle Track Systems, Inc.*, 2024 WL 4876947, at *7-8 (N.D. Cal. Nov. 23, 2024) (finding that a nonexclusive licensee could not show that defendants misappropriated "what they owned outright.").

Relying on non-precedential case law outside of this District, Defendant urges this Court to find that the DTSA does not permit misappropriation claims against any "sole and exclusive" trade secret owners. However, this Court disagrees based on the plain reading of the DTSA. The DTSA provides a broader definition of "owner," one that includes licensees, as opposed to the definition Defendant urges this Court to adopt. *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 674-75 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end."); *see, e.g.*, *Advanced Fluid Sys., Inc. v. Huber*, 958 F.3d 168, 179 (3d Cir. 2020) (holding, in analyzing

Pennsylvania's Trade Secrets Act ("PUTSA"), that a "*per se* ownership requirement for [PUTSA] misappropriation claims is flawed")[1].

Furthermore, the 2014 Exclusive License Agreement permits Plaintiffs' ability to enforce their licensed rights, and thus Plaintiff's ownership under the DTSA. The Agreement provides "[i]n the event any third party is found to be conducting business in the Licensed Territory such that it can reasonably be considered a violation of Licensee's rights under this Agreement, Licensee shall have the right, but not the obligation, to take all necessary action, including initiating legal action, to address such actions." (Ex. 1, ECF 1-1 at ¶ 9.1). Under the DTSA, Plaintiffs are owners of the La Colombe Trade Secrets in South Korea and may bring a claim for trade secret misappropriation against another "owner" for misappropriation within the scope of their rights. *See Genesis 1 Oil Servs.*, 2021 WL at *5.

The 2014 Exclusive License Agreement includes a non-compete provision that provides Defendants "shall not, directly or indirectly, without the prior written consent of Licensee engage in any activity or business operation, . . . related to, arising out of, or in connection with Coffee, the Licensed Marks, the Intellectual Property, or the La Colombe System, within the Licensed Territory[.]" (Ex. 1, ECF 1-1 at ¶ 10.1). Defendants' argument that Plaintiffs fail to plead misappropriation in South Korea is unavailing. Plaintiffs' complaint avers that Defendants disclosed the La Colombe Trade Secrets to Ralph's Coffee, without the Plaintiffs' express or implied consent, and maintained a contractual and public business relationship with Ralph's Coffee. Additionally, Plaintiffs aver that Defendants failed to prevent the establishment of Ralph's Coffee in the Licensed Territory after disclosing the La Colombe Trade Secrets, providing further

---

[1] "*Huber* at least suggests . . . the Third Circuit might view the meaning of the term 'license' in the DTSA's definition of 'owner' in the (broader) way the Court has here . . . ." *Biohaven Therapeutics Ltd. v. Avilar Therapeutics, Inc.*, 2025 WL 2443517, *14 (D. Del. May 1, 2025).

documentation of Ralph's Coffee locations in Seoul, South Korea. At this stage of litigation, Plaintiffs' complaint contains sufficient facts for this Court to reasonably infer that misappropriation could be occurring in South Korea. Thus, Plaintiffs have sufficiently pled enough factual allegations for a misappropriation claim under the DTSA.

**CONCLUSION**

For the reasons set forth, Defendants' motion to dismiss Plaintiffs' complaint is denied. An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, J.